**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

ANTHONY CHATMAN,

   Plaintiff,

vs.            Case No. 3:06-cv-1005-J-32MCR

NATIONAL RAILROAD PASSENGER
CORPORATION (D/B/A "AMTRAK")

   Defendant.
_____

**ORDER**[1]

  This race discrimination and retaliation case is before the Court on Defendant

National Railroad Passenger Corporation's Motion for Summary Judgment (Docs. 30,

33) and Plaintiff Anthony Chatman's Response thereto.  (Doc. 34.)  Plaintiff filed a

two-count complaint against Defendant alleging (1) race discrimination and

harassment and (2) retaliation, both in violation of 42 U.S.C. § 1981.  (Doc. 1.)  After

discovery, Defendant moved for summary judgment.  (Doc. 30.)  The Court heard oral

argument on the motion on May 20, 2008.

_____

[1]  Under the E-Government Act of 2002, this is a written opinion and therefore is
available electronically.  However, it is intended to decide the motion addressed
herein and is not intended for official publication or to serve as precedent.

## I.  Facts

### a.  Plaintiff starts working with Amtrak in Jacksonville

Taken in the light most favorable to Plaintiff, these are the facts.  Plaintiff, an African-American, began working as an engineer for National Railroad Passenger Corporation ("Amtrak") in Los Angeles, California in October 1998.  (Chatman Dep. 28:8-9, Oct. 23, 2007.)  While he was still employed in Los Angeles, Plaintiff visited the Jacksonville crew base of Amtrak in the Fall of 1999 to see if there were any positions available in Jacksonville.  (Id. 39:18-25.)  Plaintiff met his future supervisor, Frank Large, during that visit and told Large that he was considering working in Jacksonville.  (Id. 41:11-15.)  Large refused to shake Plaintiff's hand, told Plaintiff he would never work in Jacksonville and walked away.  (Id. 41:17-19.)

In late 1999, Plaintiff sought to leave Los Angeles and come to Florida for personal reasons; he bid for and was awarded a job in Sanford, Florida in early 2000. (Id. 36:3-5.)  However, after arriving in Florida via a cross-country drive, Plaintiff discovered that he was awarded the Sanford job in error and was told that he should instead report to Jacksonville "and claim one of the six vacant positions that were vacant" on the extra board.  (Id. 38:23-25.)  He was told to look for Darryl Murray and Frank Large.  (Id. 108:24.)

Plaintiff arrived unannounced at the Jacksonville crew base to claim one of those vacant positions in February 2000.  (Id. 109:3-4.)  However after informing

2

Murray and Large that he was there to claim one of the positions on the extra board, Murray told him that "[w]e don't have no job here for you," that the jobs were "advertised in error" and had been "abolished," and that "[y]ou need to go to the northeast corridor and work.  We don't have no position for somebody like you here." (Id. 109:5-22.)   Plaintiff left the crew base, called his union representative and after about two weeks was awarded the position in Jacksonville.

During his time in Jacksonville, Plaintiff worked as an engineer on the extra board and reported directly to Large.  (Id. 84:15-16.)  The extra board is a group of engineers who are "on call" and available "in case trains are late, in case someone goes on vacation." (Id. 65:5-7.)  Plaintiff held this position in Jacksonville with Amtrak from February 2000 until he was terminated on September 21, 2005; however he was out on leave for significant periods of time during that period.  (Id. 245:19-24.)

### b.  Plaintiff experiences racial harassment in Jacksonville

Plaintiff alleges that he was continually harassed based on his race during his time in Jacksonville.  Many of his complaints concern his direct supervisors, Frank Large and Darryl Murray.  Soon after he started marking up for the extra board, Frank Large approached Plaintiff in the office and informed him that he "might have a problem here in Jacksonville" because "we've got a lot of good ol' boys here and they may not like your hair."  (Id. 117:13-18.)  A year later in 2001, Plaintiff was involved in a train accident and Large asked him to come to the office to fill out an accident

report.  Large became angry and cursed at Plaintiff when Plaintiff handed him a time slip for his time spent filling out the report.  (Id. 149:6-18.)  Plaintiff reported the incident to an Employee Assistance Program counselor.  (Id. 149:19-23.)  About a week later, Murray and Large called Plaintiff into the office and attempted to apologize for Large cursing at Plaintiff.  (Id. 151:22-25, 152:1-2.)  When Plaintiff confronted the pair about the earlier "good ol' boys" comments, Murray said "Well, I consider myself a redneck."  (Id. 152:12-13.)  Plaintiff responded that he was "afraid" of them because "[i]t wasn't that long ago that you good ol' boys and you rednecks was hanging my people from the trees down here in the South."  (Id. 152:16-19.)  Plaintiff also describes an incident with Large in 2004 after he returned to work following an extended medical leave of absence due to a train accident.  Plaintiff claims that Large said "you tried to get my job, you tried to get me fired" and "you wrote letters to Washington" in regards to the earlier dispute about "good ol' boys" and "rednecks." (Id. 180:7-13.)

Large made a further comment that could be perceived as evidence of racial bias in June 2005.  During a discussion of the Iraq war, Large stated that "[i]f it was up to me, I would just nuke the whole Middle East."  (Id. 158:14-16.)  Plaintiff responded by stating that "Great Britain had a great part in atrocities that happened throughout the world, like with the Middle Passage into slavery.  Nobody nuked them." (Id. 158:20-23.)  Large responded to that assertion by stating that "[i]f it wasn't for the

4

British, you and your people would still be running through the jungle." (Id. 158:24-25, 159:1.)

In addition to these comments by his supervisors, Plaintiff described situations throughout his tenure in Jacksonville where he experienced discriminatory treatment at the hands of his colleagues.  Sometime in 2000, one crew member made the comment that "only queers and steers come from California" and "Yankees and carpetbaggers were coming down and taking their jobs." (Id. 125:15-16, 22-23.)  In 2004, Plaintiff had an argument with a  co-worker which led to that co-worker telling Plaintiff that "we got the KKK in Jacksonville and [an Amtrak employee then out on disability] is in the KKK."  (Id. 141:17-18.)  Either in 2003 or 2004, an African-American co-worker said "nigger, please" during an argument with Plaintiff.  (Id. 183:6-7.)  In 2005, a co-worker addressed Plaintiff by saying "How are you doing, ANC?" (Id. 146:10.)  "ANC" referred to the African National Congress.  (Id. 146:17-18.)  Plaintiff also alleges fairly constant and generalized remarks about his hair from numerous employees throughout his time in Jacksonville.

### c. Plaintiff's allegations of discrimination and his protected activity prior to termination

Plaintiff filed numerous complaints of racial discrimination and harassment with the DRO, the internal Amtrak office in charge of handling investigations regarding the Defendant's Anti-Harassment/Anti-Discrimination policy.   (Marcelle Aff. ¶¶ 3-5.)  Plaintiff also filed charges with the EEOC in October 2001.  (Doc. 34-20.)

In early 2003, Plaintiff complained to Tom Fortune, the Assistant Superintendent of Operations for Amtrak's Jacksonville District, that the process for selecting engineers to attend DSLE training was racially discriminatory. (Chatman Dep. 94:7.) While not required for promotion, DSLE training may be helpful to engineers seeking a promotion to road foreman. (Id. 96:20-24.) The selection process for a DSLE position is highly subjective and merit-based. (Murray Dep. 31:5-16, Nov. 21, 2007.) After the second selection of a person without Plaintiff's knowledge that the opportunity was available, Plaintiff complained to DRO that the selection process was racially discriminatory. (Doc. 34-9 at ¶ 8.) Plaintiff was terminated two weeks later.

### d. Plaintiff's termination for an Amtrak rule violation and dishonesty

On June 6, 2005, Plaintiff was at work, preparing to begin the ride from Miami to Jacksonville when he "felt a strange sensation in [his] back" as he was lifting his luggage up on to the train. (Id. 196:20-22.) He told his co-worker on the train that his back was hurting. (Id. 200:14-18.) Plaintiff's back was still hurting when he got off the train and ended his shift. (Id. 201:22-23.) Plaintiff went off duty without reporting an injury because he thought his back pain might be due to a preexisting injury. (Id. 210:13-14.)

Although he was not scheduled to work until June 9, Plaintiff called Fortune on June 7 to advise him of the situation. (Id. 202:13-18.) Plaintiff reported that

conversation as follows:

> A.  So I called Tom Fortune's office, and I said, "Tom, this is A.C."
> He Said, "Hey, Bud.  How are you doing?"
> I said, "Tom, I hurt my back yesterday at work."
> He says, "Are you reporting an injury?"
> I said, "No.  I have two days off before I go out on my next trip, and I
> hope it should be better by then."
> He says, "You're not reporting an injury?"
> I said, "No.  I've got two days off, and I should be okay.  I hope I'll be
> okay."
> He says, "Okay, Bud.  Keep me posted."

(Id. 202:17-25, 203:1-4.)  Plaintiff called Fortune again about his injury on June 8 and

said, "It's not getting any better.  I may have to see the doctor.  I'm not sure, but I still

have another day off."  (Id. 204:8-11.)  Plaintiff reiterated to Fortune during the call

that his injury happened at work.  (Id. 204:13-14.)  At midnight that same day, Plaintiff

called the crew scheduler and marked off that he could not work the following day

because of back pain.  (Id. 205:21-25.)

On June 9, 2005, Plaintiff went to his personal physician, Dr. Robert James,

complaining of back pain.  (Id. 206:18-19.)  After a physical examination, Dr. James

informed Plaintiff that he had a pinched nerve.  (Id. 206:21-24.)  Dr. James told

Plaintiff that because the injury happened while he was at work that it was a

workman's compensation claim and could not be billed under his personal health

insurance, and that he should call his supervisor and report an injury.  (Id. 207:1-3.)

Plaintiff called Fortune from Dr. James' office and reports the following conversation:

> So I called Tom Fortune from my doctor's office.  I said, "Tom, this is

A.C.  I'm at my doctor's office, and he told me to call and say – tell you that this is a work-related injury."
Tom says to me, he says, "You didn't tell me you got hurt at work."
I was like, "What?"
"You didn't tell me you got hurt at work."
I said, "Tom, I called you and told you what happened."
"No you didn't, You didn't say that."
Right then I knew that they were – he was going to lie.

(Id. 207:19-25, 208:1-6.)  On Fortune's orders, Plaintiff then came into the office and was escorted by Large to the hospital to be looked at in accordance with the procedure for dealing with work related injuries.  (Fortune Dep. 163:7-12, Nov. 20, 2007.)

Pursuant to a union collective bargaining agreement, on June 17, 2005, Plaintiff was charged with violating an Amtrak rule that requires employees to report work-related injuries no later than the end of the shift on the day on which the injury occurred, a safety violation for failure to report a work-related injury and dishonesty. (Doc. 34-6; Murray Dep. 67-68.)   Charging officer Darryl Murray recommended termination.  (Id.)   A hearing was held before an impartial hearing officer where Plaintiff was represented by union counsel.  (Chatman Dep. 210, Fortune Aff. ¶ 14-16.)  The hearing officer found that (1) Amtrak had proven all of the charges against Plaintiff; (2) Plaintiff had violated Amtrak's rules and (3) Plaintiff was dishonest. (Ex. 7.)   That information was provided to Superintendent Joseph Wall, who, upon consideration, approved Plaintiff's termination.  (Wall Dep. 24:5, Nov. 27, 2007.)

8

## II. Legal Standard

Summary judgment is proper where "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "The burden of demonstrating the satisfaction of this standard lies with the movant, who must present pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that establish the absence of any genuine material, factual dispute."  Branche v. Airtran Airways, Inc., 342 F.3d 1248, 1252-53 (11th Cir. 2003) (internal quotations omitted).  An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).  In determining whether summary judgment is appropriate, a court must draw inferences from the evidence in the light most favorable to the nonmovant and resolve all reasonable doubts in that party's favor.  Centurion Air Cargo, Inc. v. United Parcel Serv. Co., 420 F.3d 1146, 1149 (11th Cir. 2005).

A plaintiff can establish a prima facie case of discrimination using direct evidence of discrimination or by relying on circumstantial evidence to prove discriminatory intent.  Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004).  To establish a prima facie case using direct evidence, a plaintiff must present "evidence, that, if believed, proves [the] existence of [a] fact without inference or presumption; in other words, "[o]nly the most blatant remarks, whose intent could be

9

nothing other than to discriminate ... constitute direct evidence." Id.  This is not a direct evidence case; thus Plaintiff must establish a prima facie case on his discrimination claims pursuant to McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973), using circumstantial evidence.

In McDonnell-Douglas, the Supreme Court set forth the applicable legal framework for assessing circumstantial evidence discrimination claims.  Plaintiff is required to establish a prima facie case of discrimination by showing that: (1) he belongs to a protected class; (2) he was subjected to an adverse employment action; (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he was qualified for the job.  McDonnell-Douglas Corp., 411 U.S. at 802; Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997).  "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination."  Holifield, 115 F.3d at 1562.

If plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate some legitimate, non-discriminatory reason for the employment action, which is clear, reasonably specific and worthy of credence.  Hall v. Alabama Ass'n of Sch. Bds., 326 F.3d 1157, 1166 (11th Cir. 2003).  At this stage, the defendant has a burden of production, not of persuasion, and thus does not have to persuade a court that it was actually motivated by the reason advanced.  Id. (citing McDonnell-Douglas, 411 U.S. at 802).  The Eleventh Circuit has described this burden on the defendant

10

as "exceedingly light." Batey v. Stone, 24 F.3d 1330, 1334 (11th Cir. 1994) (citations omitted).

Once the employer satisfies its burden, the presumption against the defendant is rebutted, and plaintiff must show that the defendant's proffered reason is merely pretext for an illegal motive. McDonnell-Douglas, 411 U.S. at 802-04; Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2002). At this phase, the plaintiff must "introduce significantly probative evidence showing the asserted reason is merely pretext for discrimination." Sheppard v. Sears, Roebuck & Co., 391 F. Supp. 2d 1168, 1180 (S.D. Fla. 2005) (quoting Zaben v. Air Prods. & Chems., Inc., 129 F.3d 1453, 1457 (11th Cir. 1997)). The plaintiff cannot establish pretext merely by questioning the wisdom of the employer's reasons, at least not where the reason is one that might motivate a reasonable employer. Alexander v. Fulton Cty., 207 F.3d 1303, 1339 (11th Cir. 2000) (citing Combs v. Plantation Patterns, 106 F.3d 1519, 1543 (11th Cir. 1997)); Damon v. Fleming Supermarkets of Florida, Inc., 196 F.3d 1354, 1361 (11th Cir. 1999) (courts "are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision").

A plaintiff may establish pretext in different ways. He may either directly persuade the Court that a discriminatory reason more likely than not motivated the employer or may demonstrate "such weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." <u>Jackson v. State of Ala. State Tenure Com'n</u>, 405 F.3d 1276, 1289 (11th Cir. 2005).  However, standing alone, a deviation from company policy does not establish discriminatory animus.  <u>Mitchell v. USBI Co.</u>, 186 F.3d 1352, 1355-56 (11th Cir. 1999).

## III.  Discussion

### a.  Plaintiff's race discrimination claims

Plaintiff advances two theories to support his race discrimination claims under Count I of his complaint: (1) Disparate treatment and (2) hostile work environment. Further, Plaintiff seemingly asserts two separate examples of disparate treatment discrimination: (1) his non-selection for DSLE training and (2) his termination.  While his claims are brought pursuant to 42 U.S.C. § 1981, the Eleventh Circuit has held that section 1981 race discrimination claims are analyzed in the same manner as claims brought pursuant to Title VII.  <u>See</u> <u>Shields v. Fort James Corp.</u>, 305 F.3d 1280, 1281 (11th Cir. 2002); <u>Turnes v. AmSouth Bank, N.A.</u>, 36 F.3d 1057 (11th Cir. 1994).

### 1.  Plaintiff's disparate treatment claims

Initially, Plaintiff's assertion that his non-selection for DSLE training was racially discriminatory must fail because it is not an adverse employment action within the meaning of section 1981. "[T]o prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a <u>serious and material</u>

change in the terms, conditions, or privileges of employment." <u>Davis v. Town of Lake Park, Fla.</u>, 245 F.3d 1232, 1439 (11th Cir. 2001) (emphasis in original). "An employment action is considered 'adverse' only if it results in some tangible, negative effect on the plaintiff's employment." <u>Lucas v. W.W. Grainger, Inc.</u>, 257 F.3d 1249, 1261 (11th Cir. 2001).

Here, Plaintiff's non-selection for DSLE training did not cause a serious or material change in his employment. DSLE training was not a promotion and did not guarantee a future promotion to road foreman. Plaintiff's assumption that the training would have helped him become a road foreman is insufficient to make his non-selection an adverse employment action. <u>See Davis</u>, 245 F.3d at 1238 ("[T]he asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment"). In fact, Fortune testified that the most recent individual selected for the position of road foreman did not have the DSLE training. (Fortune Dep. 61:19-25.)   Plaintiff's situation is more similar to cases where an employee is denied an extra-training opportunity, a situation that does not  normally qualify as an adverse employment action. <u>See McGuire v. Miami-Dade County</u>, 418 F.Supp 2d 1354, 1361 (S.D. Fla. 2006) (denial of training opportunities not an adverse employment action without proof of tangible harm); <u>see</u> <u>also</u> <u>Harvey v. City of Bradenton</u>, No. 8:04-cv-1748-T-EAJ, 2005 WL 3533155, *5 (M.D. Fla. Dec. 22, 2005) (denial of employee's training requests was not an adverse employment action

because it did not change the employee's "salary, title, position, or job duties"); <u>but see</u> <u>Murdick v. Catalina Marketing Corp.</u>, 496 F.Supp 2d 1337, 1356 (M.D. Fla. 2007) (finding a jury question on whether the lack of training could be an adverse employment action when the missed training directly led to negative performance evaluations). Plaintiff's non-selection for the DSLE training in this case is immaterial to both the actual job held by Plaintiff and the reasons for his eventual termination from Amtrak. Accordingly, Plaintiff's discrimination claim fails on these grounds because non-selection for the training was not an adverse employment action.

On the other hand, Plaintiff's termination from Amtrak is undoubtedly an adverse employment action. For purposes of this motion, there is only one contested element of the prima facie case–whether a similarly situated, non-African American employee committed essentially the same violation but did not suffer the same adverse action. <u>Holifield</u>, 115 F.3d at 1562. "In cases involving alleged racial discrimination in the application of work rules to discipline an employee, the plaintiff must show either (a) that he did not violate the work rule, or (b) that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct." <u>Moore v. Ala. Dept. of Corrections</u>, 137 F. App'x 235, 238 (11th Cir. 2005). Courts require "the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from

14

second-guessing employer's decisions and confusing apples with oranges." <u>Maniccia v. Brown</u>, 171 F.3d. 1364, 1368-69 (11th Cir. 1999).

In attempting to meet his burden, Plaintiff brings forward three potential comparators: Russell Denson, Brian Bolin and James Gorsky.  Denson and Bolin are not comparators as a matter of law; only Gorsky requires further discussion.  Gorksy was a white engineer who was charged with violating Amtrak Standards of Excellence "Attending to Duties," Trust & Honesty, Safety, and "Safety Rules for Train Service Employees."  (Doc. 34-16.)  The description of the incident leading to those charges as stated in Gorsky's Discipline Assessment Worksheet is as follows:

> On May 5, 2005, while working as Conductor on train 92(5) Miami - Winter Haven, Fl. Mr. Gorsky was stepping off the train at Winter Haven, FL, he stated that his right leg gave way on him and he was in a lot of pain in his right knee.  Witness accounts place his injury several minutes later when he stepped on a rail running thru the platform causing his knee to give way.

(Id.)  The recommended discipline for these infractions was a 30-day suspension and a final warning and that discipline was assessed after a hearing where the charges made by Amtrak were proven.  (Id.)  In addition to asserting that Gorsky is an appropriate comparator for the purposes of his prima facie case, Plaintiff argues that the conduct of Fortune in relation to Gorsky is also relevant.  In his affidavit, Gorsky's supervisor Daniel Stokes states:

> I was initially told by Tom Fortune, the Assistant Superintendent of Operations for the Jacksonville District and my immediate supervisor to permit Mr. Gorsky to sign a waiver rather going through a formal

> investigation.
>
> I was later told by Mr. Fortune that Mr. Gorsky should not be allowed to sign a waiver due to engineer Anthony Chatman being recently terminated and that Mr. Chatman would have grounds for a lawsuit if we allow Mr. Gorsky to sign a waiver.

(Stokes Aff. ¶¶ 8-9.)   Plaintiff argues that "[n]ot only does this provide evidence of Fortune's knowledge that Chatman and Gorsky were being treated differently for engaging in the same conduct, but it also provides evidence of Fortune's discriminatory intent."  (Doc. 34.)

Recognizing the high bar in the Eleventh Circuit for comparator evidence to be viable, the Court nevertheless finds that, for summary judgment purposes, Gorsky and Plaintiff were charged with "nearly identical" dishonesty and safety violations and that Gorsky only received a suspension while Plaintiff was terminated.  Thus, Gorsky is a sufficient comparator in this case and plaintiff has established a prima facie case of race discrimination.  Accordingly, the next step under McDonnell-Douglas requires Defendant to articulate a legitimate, non-discriminatory reason for Plaintiff's termination.  See Olmstead v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998). Defendant has done so here, stating that it terminated Plaintiff for dishonesty and failing to timely report a work related injury.  Accordingly, the burden shifts back to Plaintiff to establish that Defendant's reason is pretext for a discriminatory motive.

After consideration, the Court finds that genuine issues of material fact exist that preclude summary judgment on Plaintiff's disparate treatment termination claim.

16

That Gorsky was in a nearly identical situation and committed nearly identical conduct but was punished less severely is probative of pretext.  <u>See</u> <u>e.g.</u> <u>Rioux v. City of Atlanta, Ga.</u>, 520 F.3d 1269, 1281 (11th Cir. 2008) (analyzing comparator evidence in the context of pretext); <u>Damon</u>, 196 F.3d at 1363 (when employer justifies termination based on a work rule violation, plaintiff may show pretext by submitting evidence that "other employees outside the protected class, who engaged in similar acts, were not similarly treated) (internal citations omitted).  Other evidence brought forward by Plaintiff further supports his attempt to show pretext.  This includes Plaintiff's testimony that he told Fortune he was hurt at work on the day of the injury, the unsupported allegations made by Labor Relations that Plaintiff filed the claim to obtain monies during his absence and the comment from the final decisionmaker, Joseph Wall, that the proposed discipline against Plaintiff "seem[ed] like a stretch." (Doc. 34-15.)   Taking all these facts together, the Court finds that Plaintiff has come forward with sufficient evidence of pretext to defeat summary judgment and bring this claim to a jury.

### 2.  Plaintiff's hostile work environment claim fails as a matter of law

To establish a prima facie case of hostile work environment discrimination, Plaintiff must show that:  (1) he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment was based on a protected characteristic; (4) that the harassment was sufficiently severe or pervasive to alter the

17

terms and conditions of employment and create a discriminatorily abusive working environment; and (5) employer responsibility through direct or vicarious liability.  See Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002).  The Court will not analyze all five of these elements, as Plaintiff's failure to show conduct sufficiently severe and pervasive enough is dispositive of his claim.

The touchstone of a hostile work environment claim is the presence of severe and pervasive harassment based on a protected characteristic.  See Gupta, 212 F.3d 571, 583 (11th Cir. 2000) (noting that the requirement of severe or pervasive conduct "is the element that tests the mettle of most sexual harassment claims").  This element is only satisfied upon a showing that "the workplace is permeated with discriminatory intimidation, ridicule, and insult."  Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993).  In support of his hostile work environment claim, Plaintiff complains of the following incidents: (1) Large refusing to shake Plaintiff's hand in 1999; (2) Large and Murray telling Plaintiff that there was no job for someone like him in Jacksonville and that he should go to work in the northeast corridor; (3) repeated comments by Large about Plaintiff's hair and when it would be cut; (4) Large's 2005 comment about Plaintiff's people "running through the jungle; (5) Large and Murray's remarks about being "good ol' boys" and "rednecks; (6) Large's confrontation with Plaintiff about trying to get him fired; (7) isolated comments in 2000 from unidentified coworkers talking about "yankees" and "queers and steers"; (8) coworker's 2004

comments about the KKK; (9) coworker's reference to Plaintiff as ANC; and (10) co-worker using a racial slur.

The "severe or pervasive" element is measured both subjectively and objectively. See Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir. 1999). "The employee must 'subjectively perceive' the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." Id. The analysis of the conduct's objective severity or pervasiveness is guided by four factors: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Id.; see also Reeves v. C.H. Robinson Worldwide, Inc., 525 F.3d 1139, 1146 (11th Cir. 2008) (citing Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998).

Looking at those factors, Plaintiff's hostile work environment claim fails as a matter of law. The comments allegedly made to Plaintiff were fairly infrequent; only a handful during a three-year period.[2] While Plaintiff does allege that comments were made about his hair throughout his Jacksonville employment, these comments were not so pervasive as to alter a condition of Plaintiff's employment. The severity of the

---

[2]     While Plaintiff was officially employed for more than five years in Jacksonville, he was out on leave for extended periods during that time.

19

comments is mixed.  While the racial references are unacceptable and offensive, other allegations are not very severe at all.  On the whole, the first two factors are fairly balanced, perhaps leaning slightly in Defendant's favor.

However, the third and fourth factors of the <u>Mendoza</u> test tip this case decidedly in Defendant's favor.  Most of the comments alleged by Plaintiff are merely offensive utterings.  Comments about Plaintiff's hair and "queers and steers," while perhaps embarrassing, are not physically threatening or humiliating.  The few comments that tread closer to the line were isolated incidents of insufficient severity to establish liability on their own.  See <u>Davis v. City of Panama City, Fla.</u>, 510 F. Supp 2d 671, 685 (N.D. Fla. 2007) (supervisor's statement to plaintiff to "watch his back because there were still a lot of closet Klans" in the police department and other comments, while "despicable," were too sporadic and isolated to materially alter the terms and conditions of his employment).  Additionally, the remarks alleged by Plaintiff did not unreasonably interfere with his job performance.  While the comments may have caused Plaintiff some emotional distress, the incidents largely consisted of brief encounters lasting only a few seconds; those incidents did not prevent Plaintiff from doing his job.

Courts in the Eleventh Circuit have granted summary judgment on hostile work environment claims in cases with facts much more egregious than those presented here.  See <u>e.g.</u> <u>Barrow v. Georgia Pacific Corp.</u>, 144 F. App'x 54 (11th Cir. 2005).  In

Barrow, the employee presented evidence of "displays of the rebel flag on tool boxes and hard hats, the letters 'KKK' on a bathroom wall and on a block-saw console, and a noose in another employee's locker." Id. at 57. Additionally, the employer's supervisors used racial slurs in the workplace, including called the employee "nigger," "boy" and telling him "that if he looked at 'that white girl' he would 'cut' him." Id. Nevertheless, the Eleventh Circuit affirmed the district court's grant of summary judgment because, despite being "discriminatory and offensive," the evidence presented by the employee was not "sufficiently severe or pervasive." Id. (quotations omitted); see also Davis, 510 F. Supp 2d at 685; EEOC v. FLTVT, LLC, No. 6:05-cv-1452-Orl-28KRS, 2007 WL 3047136, *5-6 (M.D. Fla. Oct. 18, 2007). Accordingly, the Court will grant summary judgment on the hostile work environment portion of Plaintiff's Count I race discrimination claim.

**b. Plaintiff's retaliation claims**

In Count II of his complaint, Plaintiff asserts that he was retaliated against for complaining to various Amtrak officials about racial discrimination and the hostile work environment. (Doc. 1 ¶ 103.) To establish a prima facie case of retaliatory termination, Plaintiff must show (1) that he engaged in statutorily protected activity; (2) that he suffered an adverse employment action; and (3) that there is some causal connection between the two events. Farley v. Nationwide Mutual Insurance Co., 197 F.3d 1322, 1336 (11th Cir. 1998).

Plaintiff has established a prima facie case of retaliation.  His termination was assuredly an adverse employment action and there is a sufficient relationship between Plaintiff's many complaints and his termination as to provide the requisite "causal connection."  Defendant argues that Plaintiff did not have a reasonable, good-faith belief that he was suffering illegal discrimination when he made his complaints.  However, the law Defendant cites in support of that argument is distinguishable from this case because the alleged discrimination in those cases consisted mainly of extremely isolated incidents of questionable severity.  See e.g. Butler v. Ala. Dept. of Transp., No. 07-13358, 2008 WL 2901768, *4 (11th Cir. July 30, 2008) (single incident where non-supervisory co-worker used racial epithet in the presence of minority employee away from work did not give rise to reasonable belief that conduct was illegal discrimination).  Defendant also argues that there is no causal connection between Plaintiff's statutorily protected activity and his termination.  However, Plaintiff's numerous complaints to the DRO and his 2001 complaint to the EEOC, coupled with Large's confrontational statement in 2004 that Plaintiff "tried to get [his] job, tried to get [him] fired," provide a sufficient causal connection in this case.  Accordingly, Plaintiff has established a prima face case of retaliation and the burden shifts to Defendant under McDonnell-Douglas to put forward a legitimate, non-discriminatory reason for Plaintiff's termination.  As discussed in relation to the discrimination claim, Defendant has done so here and the burden shifts back to

22

Plaintiff to prove that Defendant's proffered reason is mere pretext.

Plaintiff has met his burden.  As discussed in relation to the discrimination claim, there is sufficient evidence that Defendant's proffered reason for Plaintiff's termination was pretext for an illegal motive to create a jury question.  Accordingly summary judgment will be denied on Count II of the complaint.

Accordingly, it is hereby

**ORDERED:**

1. Defendant's Motion for Summary Judgment (Doc. 30) is **GRANTED** in part and **DENIED** in part, consistent with this Order.

2. This case is **SET** for a telephone status conference on **Monday, September 22, 2008** at **3:00 p.m.** before the undersigned.  Counsel for Plaintiff is directed to initiate the telephone conference call by calling counsel for the Defendant and then calling the Court's polycom telephone line, (904) 549-1949.[3]  The call should be placed to the Court five minutes prior to the scheduled hearing time.

**DONE AND ORDERED** at Jacksonville, Florida, this 5th day of September, 2008.

TIMOTHY J. CORRIGAN
United States District Judge

---

[3]    To maximize the quality of the audio-connection, counsel are requested not to use cell phones or speaker phones during the hearing.

23

jcd.
Copies to:
Counsel of Record